Albert Nelson, Administrator of Estate of Louis Albert Nelson, Deceased, and Dorothy Peyton, Administratrix of Estate of John A. Peyton, Deceased, Appellants, v. Floyd Armistead, Appellee.

Gen. No. 42,665.

Heard in the third division of this court for the first district at the June term, 1943. Opinion filed November 7, 1945. Released for publication November 27, 1945.

Royal W. Irwin and James A. Dooley, both of Chicago, for appellants.

Charles E. Green, for appellee.

Mr. Justice Lewe delivered the opinion of the court.

Plaintiffs appeal from a judgment in favor of defendant entered on the verdict of a jury which found for defendant, in a suit brought under the Injuries Act to recover damages resulting from the wrongful deaths of plaintiffs' intestates Louis Nelson, aged 10, and John Peyton, aged 5, while riding as guests in defendant's automobile.

On Sunday, January 23, 1938, the defendant, Floyd Armistead, drove his automobile, an Oldsmobile four-door sedan, from Chicago to Pistakee Lake in Lake county, Illinois, accompanied by his nephew Ruben Armistead and one Albert Nelson, father of Louis Nelson, for the purpose of fishing through holes cut in the ice. When they reached the south shore line of a v-shaped inlet in the southeastern portion of the lake, Nelson walked out on the ice 25 or 30 feet, to make certain that it was of sufficient thickness to sustain the weight of the automobile and its passengers. After examining the ice, Nelson assured the defendant that it was "O. K." Then, under Nelson's guidance, defendant drove his car in a northerly direc-

tion over the ice about 100 feet from shore, following the irregular shore line of the v-shaped inlet to a place known as LeMoon's Point, where he proceeded to the west about a quarter of a mile. Here by prearrangement they met other persons who constituted their fishing party.

Defendant's car arrived at the fishing grounds about 11:30 a. m. After fishing for approximately two hours, Howard Peyton, father of John Peyton, deceased, suggested to defendant that he drive his car to the automobile of one Edward Murphy, also a member of the fishing party, to get more fishing tackle. Murphy's car was parked on the shore near the base of the v-shaped inlet and directly south of the point where the defendant and others had been fishing. About 1:15 p. m., the defendant, accompanied by Harold Murphy, son of Edward Murphy, Louis Nelson, John Peyton, and one Jess Lynn, proceeded to drive directly south toward the Murphy car. After defendant's car had traveled about 1000 feet it crashed through the ice, leaving about six inches of the top protruding above the water. As the car submerged, Murphy, Lynn and the defendant managed to extricate themselves almost immediately, but the young boys, Louis Nelson and John Peyton, were brought to the surface after some delay. Bruce Balding, a doctor who happened to be in the vicinity, came to the scene of the tragedy a short time after the accident. He administered drugs and artificial respiration to the boys, but the resuscitative measures proved futile.

The gist of the amended complaint was that the defendant wantonly and wilfully drove his automobile across the ice in the lake where it was "thin and insecure." Defendant's answer and amendment of the answer to the amended complaint aver (a) that both of the intestates of the plaintiffs were guests riding in the automobile of the defendant without payment for such ride, and that the occurrence was not

caused by any wilful or wanton conduct on the part of the defendant; (b) that the fathers of both of plaintiffs' intestates were present and consented to plaintiffs' intestates becoming guest passengers under the circumstances, and thereby were guilty of wanton and wilful misconduct contributing to cause the alleged damages to the plaintiffs. Plaintiffs' contentions are that the defendant was guilty of wilful and wanton conduct in driving his automobile directly south over a much exposed area of ice instead of following the route along the eastern shore line where the ice was safe; that the verdict of the jury is against the manifest weight of the evidence; that defendant's counsel's argument was prejudicial; and the court erred in instructing the jury.

Plaintiffs introduced the testimony of Jess Lynn, Albert Nelson, and Dr. Balding who testified by deposition, as to the occurrence. Lynn testified that around 11:30 a. m. he walked out on the ice with Albert Nelson's son Louis; the weather was clear and the temperature a little above freezing. As they walked out, the ice began to get sloppy. There were at least a hundred cars scattered in groups of two to four in different spots. About the time he got into the defendant's car he saw the defendant talking with Nelson. While they were driving south, headed for the Murphy car, he observed water on the ice about them and said to the defendant, "Armistead, you are getting over where the ice is bad." Defendant did not respond and the witness repeated the same statement, and was about to repeat it again when the defendant said, "No, I am going the right way; this is the way I come out this morning." Lynn did not ask defendant to stop the automobile or turn to the right or left. Defendant continued to drive south in a straight line. Lynn also testified that some of the puddles of water on the ice were two or three inches deep and three or four feet square or larger.

Albert Nelson, father of Louis Nelson, one of the victims of the accident, testified that before they drove on to the ice he walked out 25 or 30 feet and then returned to the defendant's car and said, "Well, let's go. It is just as strong as it was last Sunday." While they were proceeding north, "There were tire marks on the surface of the ice up to LeMoon's Point," but beyond that no tire marks were visible; that as they were driving out to the fishing grounds, the ice appeared different from what it was a week before; there was slush and there were pools of water to the left. When defendant was about to start back toward the Murphy car, witness's son Louis asked permission to ride with defendant, which was granted by Nelson, the father. Nelson then told defendant to head straight for the "tall stairs," after which Nelson paid no further attention to the direction defendant's car traveled, since he expected defendant "to use his own judgment."

Dr. Bruce N. Balding, who was not acquainted with any of the occupants of the car, testified that there were tire marks along the shore to LeMoon's Point, and characterized this as the normal route of approach. There were no signs marking the way for cars to travel to this fishing place, nor were there any signs indicating where there might have been thin ice.

For the defense, six witnesses, including the defendant, gave testimony as to the occurrence.

Defendant testified as follows: That he lived in Chicago and operated a bakery there; he had known Albert Nelson, father of Louis Nelson, since 1922, and Howard Peyton, father of John Peyton, since 1934; that at the time of the accident Howard Peyton was employed in defendant's baking establishment. The first time he had fished through the ice at Pistakee Lake was in 1937, when he was accompanied by Albert Nelson. On the Sunday preceding the occurrence in question, he had fished through holes at approximately

the same place, with Nelson and Peyton. He was not "familiar with the lake at all." When they reached the southern shore of the v-shaped inlet, Nelson, after examining the ice, said, "It is perfectly safe as it was last Sunday. It is strong enough to hold a freight train." They took the same course as on the Sunday before, and saw many people fishing there. Peyton asked the witness to get more fishing equipment and tackle, and then the Nelson boy and the Peyton boy asked their fathers, and were given permission to accompany defendant. The little Peyton girl wanted to go too, but her father told her "there were plenty in the car now." Defendant further testified, "I headed back for the same white building that was visible where we had entered the lake that morning; there was moisture on the ice by that time, and no tracks of any kind were visible; as far as I know I was going over the same route that we had come in the morning; to the best of my knowledge we were about fifteen feet from the route we had used to go out in the morning; I don't remember seeing the tall stairs; I was always guided by the white house." He further testified that this was the first time he had driven across the ice without Nelson's guidance. Defendant denied that Jess Lyhn said anything to him while he was driving.

John Pitzen, a resident of Johnsburg, Illinois, and investigator for the Department of Conservation, testified that the tracks made on the lake by automobiles had melted off around noon; that there was water over the whole lake that day and tire marks were not distinguishable any more; and that he did not know any of the members of the fishing party.

Frank Bella, testifying in behalf of the defendant, said there were several hundred automobiles on the ice; and that he helped remove the boys from the defendant's car after it broke through the ice.

Ruben Armistead, nephew of the defendant, testified that he owned and operated a wholesale butter and egg business; that when they reached the south shore of Pistakee Lake, Nelson got out and went on the lake and said that the ice was about 18 inches thick. He did not see any cracks in the ice, nor were there any warning signs directing automobiles to take any particular route. He was fishing at the time of the accident, about three hundred yards from the place where the car went through the ice, which was directly south of him toward the shore. He did not remember seeing any tire tracks on the ice as they drove out to the fishing grounds. He only heard Nelson tell his uncle which way to drive.

Edward E. Murphy, testifying in behalf of defendant, said he was sales manager for Anheuser-Busch, and that he had known defendant for about ten years. Peyton wanted to get fishing tackle from the back of his car and he gave his son Harold the keys. The defendant drove back from the fishing holes in a southeasterly direction. At the time of the accident, water was standing all over the ice on the lake.

Harold Murphy, one of the passengers in defendant's car at the time of the occurrence, testified that he lived in Skokie, Illinois, and was employed as a baker. He did not know which direction the automobile went when it left the fishing grounds; that there was water all over the ice. He did not recall any conversation between Lynn and the defendant as they were riding in the car.

At the close of all the evidence, defendant offered a written motion for directed verdict and an instruction finding the defendant not guilty, upon which the court reserved its rulings.

Plaintiffs' theory is that the defendant was guilty of wilful and wanton conduct in the operation of his car on this body of ice in that he traveled, despite

specific directions and warnings, from a point out on the lake directly south to the southern shore, over a large exposed area of ice, instead of following the usual route along the eastern shoreline.

Defendant contends that there is no evidence tending to support a charge of wilful and wanton conduct in the operation of his automobile.

In considering a motion for a directed verdict, the evidence must be considered in its aspect most favorable to the party adverse to the motion. (*Shutan v. Bloomenthal*, 371 Ill. 244, 254.) A review of all the evidence is required to determine whether there is any evidence, taken in its most favorable light, which tends to prove the charges in the complaint. (*Darmody v. Kroger Grocery Co.*, 362 Ill. 554; *Bartolucci v. Falleti*, 382 Ill. 168, 173.)

Plaintiffs' right to recover is governed by section 42–1 of the Motor Vehicle Act (Ill. Rev. Stats. 1945, ch. 95½, par. 58a [Jones Ill. Stats. Ann. 85.064(1)]), which provides:

"No person riding in a motor vehicle as a guest, without payment for such ride, nor his personal representative in the event of such guest, shall have a cause of action for damages against the driver or operator of such motor vehicle or its owner or his employee or agent for injury, death or loss, in case of accident, unless such accident shall have been caused by the wilful and wanton misconduct of the driver or operator of such motor vehicle or its owner or his employee or agent and unless such wilful and wanton misconduct contributed to the injury, death or loss for which the action is brought."

In construing our guest statute in *Clarke v. Storchak*, 384 Ill. 564, 579, the court said:

"That there should be a difference between the liability of a person who, out of the generosity of his heart, renders gratuitously some service to his fellow

traveler over those rendering such service for hire and barter, can hardly be questioned. Those who are charitably inclined should not be restrained by fear of the consequences of their own charitable act and the recipients should not be permitted to gain by the generosity of their host. Undoubtedly the legislature, in adopting this act, was aware of the frequency of litigation in which passengers, carried gratuitously in automobiles, have sought the recovery of large sums for injuries alleged to have been due to negligent operation, and where, in the use of the automobile, which is almost universal, generous drivers might find themselves involved in litigation that often turned upon questions of ordinary negligence. It was evidently the intention of the legislature not only to correct this abuse but to promote the best interests of the people in their relation to each other.''

Negligence and wilful and wanton misconduct are not synonymous. The distinctions between these terms are clearly defined in *Chicago, R. I. & P. R. Co. v. Hamler,* 215 Ill. 525, 540. There the court said, at page 540:

''Negligence and wilfulness are as unmixable as oil and water. 'Wilful negligence' is as self-contradictory as 'guilty innocence.' The substantive remains the same substantive, whatever the adjective.''

In the instant case there can be no recovery unless the proof shows that the accident which resulted in the death of the plaintiffs' intestates was caused by defendant driving his automobile across the ice ''where it was thin and insecure'' wantonly and recklessly. To constitute a wanton act, the party doing the act or failing to act must be conscious of his conduct and, though having no intent to injure, must be conscious, from his knowledge of the surrounding circumstances and existing conditions, that his conduct will naturally and probably result in injury. (*Bartolucci v. Falleti,* 382 Ill. 168, 173, 174.)

In support of plaintiffs' contention, counsel stresses
the recent case of *Huestis v. Lapham's Estate,* 113 Vt.
191, 32 (2d) Atl. 115. In that case Lapham was
charged with gross and wilful negligence in an action
brought under the guest statute of Vermont. Across
the southern end of Lake Champlain, Lapham, driver
of the automobile in question, marked a road about
half a mile long on the ice by setting bushes three or
four feet high, extending from Ferry Hill, Vermont to
Crown Point, New York on the opposite shore. It was
the custom of those residing in the vicinity to go over
the ice along a route marked by these bushes. Because
of a current which made the ice thin and dangerous
opposite and northerly of the point on the Vermont
shore, the route ran southerly for about ten rods and
then turned and ran westerly directly to the New York
side. The accident happened in January 1942. The
weather was mild and it had rained. Mrs. Huestis
and Lapham talked for about a half hour about
whether they would go home by the toll bridge or over
the ice. Several times she said she was afraid to go
back by way of the lake because there was so much
water on the ice, and several times Lapham answered
that the ice was "sixteen inches thick and plenty
safe," that he had staked out the road and that she
had ridden with him before and was never afraid. Mrs.
Huestis finally said, "If you know that the lake is
safe, then I will ride with you." About 5:30 p. m. she
drove away with Lapham at the wheel. Mrs. Huestis
was sitting on the front seat beside him, holding her
daughter in her lap, and one Finn was on the back
seat. Instead of crossing on the bushed road, Lap-
ham's car bore north of it and proceeded directly to
the place where the ice was thin. When it neared the
Vermont shore it broke through the ice about 150 feet
north of the bushed road. All of the passengers, in-
cluding Lapham, drowned. In its opinion the court
points out that Lapham bushed out the road over the

lake so as to avoid the thin ice opposite the point on the Vermont side; that after assuring Mrs. Huestis that she would be perfectly safe, he drove north of the bushed road for almost the entire distance across the lake, directly toward a place which he *knew* to be dangerous; and, under these circumstances, the court held the jury could properly infer that Lapham's act of driving where he did was not due to error in judgment, momentary inattention, or loss of presence of mind, but amounted to a failure to exercise even a slight degree of care and to indifference to his duty to his guests and utter forgetfulness of their safety, and constituted gross negligence.

In the case at bar there were no markers of any kind except some tire marks along the shore extending from the point where Nelson said the ice was ''O. K.'' to LeMoon's Point. While the party was fishing during the mid-day hours, most or all of these tire marks were obliterated by the melting of the ice. No current or open water gave notice to defendant that the ice was more dangerous over the route he took than over any other route.

In the *Huestis* case, Lapham, the driver, staked out the road and knew of its hazards, whereas, in the instant case, the record does not disclose that the defendant had any knowledge that he was incurring an unnecessary hazard. In fact, plaintiffs' witness Lynn corroborates defendant's testimony that defendant believed he was returning over the same route he took in coming out in the morning. If it be assumed that the defendant traveled a different route than that suggested by Nelson, the only inference that can be drawn from the evidence is that he erred in his judgment because of his unfamiliarity with this area.

In their brief, plaintiffs' counsel cite many other cases, all of them involving guest passengers riding in automobiles while being driven on public highways. The facts in those cases are dissimilar. No case from

the courts of this state has been cited in the briefs, nor have we been able to find any, involving a factual situation the same as or similar to that in the present case.

■■ We have made a careful study of the record, and from application of the principles laid down in *Bartolucci v. Falleti*, 382 Ill. 168, and *Clarke v. Storchak*, 384 Ill. 564, and the cases cited in these decisions, to the facts of the instant case, we conclude that plaintiffs failed to introduce any evidence, taken in its most favorable aspect, which tends to prove the essential allegations of the amended complaint. Therefore, the trial court should have granted the written motion for a directed verdict and should have given the instruction finding the defendant not guilty, at the close of all the evidence. (*Herbst v. Levy*, 279 Ill. App. 353; *Fina v. Richardson*, 293 Ill. App. 133.)

■ We have not discussed the other issues presented in the briefs and arguments, since that has not been necessary for a disposition of this cause. Where the plaintiff has no cause of action and the jury reaches a proper conclusion under the law, it is immaterial whether the court erred in its rulings during the trial. (*Luly Stores Co. v. Hartman*, 235 Ill. App. 319, 322.)

Since a proper conclusion was reached in this case, the judgment in favor of the defendant is affirmed.

*Judgment affirmed.*

KILEY, P. J., and BURKE, J., concur.