David Bernier, Administrator of the Estate of Geraldine
Bernier, Deceased, Plaintiff-Appellant, v. Barbara
Skripek, Defendant-Appellee.

Gen. No. 50,014.

First District, Fourth Division.

August 7, 1967.

Rehearing denied September 19, 1967.

McCORMICK, J., dissenting.

Murphy and Murphy, of Chicago (Jerome T. Murphy, of counsel), for appellant.

Kirkland, Ellis, Hodson, Chaffetz & Masters, of Chicago (David Jacker, Francis B. Libbe, and Alan H. Swanson, of counsel), for appellee.

MR. PRESIDING JUSTICE ENGLISH delivered the opinion of the court.

Action was brought by plaintiff, as Administrator of the Estate of Geraldine Bernier, his wife, who died as a result of injuries sustained when the automobile in which she was riding as a guest collided with a guardrail or bridge abutment situated adjacent to the street on which the vehicle was being driven by defendant. At the close of plaintiff's case, the trial judge directed a verdict in favor of defendant. Motions by plaintiff for judgment notwithstanding the verdict and for a new trial were denied. The only point raised on appeal is that it was error for the court to have directed the verdict.

On the issue of liability there were only three witnesses: a service station attendant, a State Trooper, and defendant (called as a witness under section 60 of the Civil Practice Act). There follows their testimony:

*Defendant, Barbara Skripek*

Deceased arrived at defendant's home in the late afternoon on September 21, 1957. At approximately 5:30 p. m., deceased, defendant, and defendant's brother, William, left the Skripek home in Roseland and rode with William in his 1956 Pontiac to the home of his friend located at 88th Street and Cottage Grove. At that point William left the car and defendant moved into the driver's seat. The girls planned to visit defendant's sister who lived at 4501 West 180th Street. They arrived there at about 7:30 p. m., had coffee and cake, and stayed until 10:45 p. m. Defendant and deceased then left in the Pontiac for the long ride home, with defendant driving. Defendant was familiar with the car, having driven it two or three times a week during the six or eight months her brother had owned it.

The evening was dark, but clear. Defendant had driven home from her sister's house on six or seven prior occasions, and had been in the habit of taking Cicero Avenue north to 127th Street and then going east on 127th Street to State Street which ran close to her residence in Roseland. On the evening of the occurrence, however, defend-

ant changed her route and proceeded east on 180th Street until she came to a dead end. She then turned right and proceeded south to 187th Street where she again turned right and headed west. By this time defendant had completely lost her bearings. She had never driven in the area into which her new route took her, and to add further to her confusion the streets in the neighborhood turned and wound around. All prior visits to her sister's home had been in the daytime and she had never driven home from there at night. Another right turn headed defendant in a northerly direction until she arrived at an intersection where there was a gas station. Defendant drove into the gas station and asked the attendant for directions back to Roseland. He informed her that she was then on the southeast corner of 127th Street and Harlem, a substantial distance west of her home.

When defendant pulled out of the gas station, she turned east on 127th Street, accelerating the car gradually. She did not try to get speed quickly. The two girls were conversing and the car radio was turned on. The headlights were functioning normally at low beam and defendant could see a distance of fifty to seventy-five feet ahead. The highway was unlighted. Defendant drove in the center lane of the two eastbound lanes after leaving the gas station, with her left wheels either on or "very slightly over" the center line of the road. Being unfamiliar with the road, she felt safer in that lane. There was no traffic in front of or behind defendant's car and nothing obstructed her view of the road, which was made of concrete. Defendant was not confused after learning the way at the gas station, although she had been confused prior to that time. She had been driving with the headlights on high beam but lowered them on entering the gas station and did not raise them again. She was not late for anything, and was in no hurry to get home. She had her hands on the wheel at all times after leaving the gas station until hitting the guardrail. At no time did

121

she lose control of the vehicle. She was looking straight ahead after leaving the gas station and never took her eyes off the road. She was not distracted by anything. She could see the right-hand edge of the pavement, but did not observe that the highway narrowed. She saw no traffic signs.

Deceased asked defendant to move from the center lane "over closer to the right-hand side of the road, because she would feel safer and more comfortable" if she did so. To satisfy deceased, defendant moved the car to the right, but she did not swerve the wheel very quickly or suddenly. The impact with the guardrail occurred a split second thereafter. At the time of impact, defendant's car was proceeding at a speed between 25 and 35 miles per hour. Defendant had her foot on the accelerator continuously, and never applied the brake after leaving the gas station, although she could not recall whether her foot was on the accelerator at the time of the impact. She never saw the guardrail.

*Gerald Grosskurth, an Illinois State Trooper*

He arrived at the accident scene shortly after the occurrence. Both girls were still in the Pontiac and both were injured. The car was a few feet from a guardrail protecting a culvert about a block east of Harlem on 127th Street. The right front fender of the car had collided with the guardrail. The car was facing in a southeasterly direction. He did not see any skid marks. As 127th Street moves east from Harlem, it narrows down at this culvert or guardrail. West of the culvert it is four lanes wide. East of the culvert it is two lanes wide. "The place where the highway narrows down from four lanes to two lanes is right up close to the culvert. As you are eastbound, the road narrows immediately in front of the culvert. Anyone driving in the outside lane, that is, the lane closest to the edge of the road, as they approach from the west going east—approach the culvert and

122

guardrail—would have to move to the left or smash right into the guard rail." There was no obstruction to the center lane.

There were no street lights. There were no signs from Harlem to the culvert, such as "Pavement Narrows," "Road Merges," or the like. There was a center line down the middle of the road. Photographs in evidence (defendant's exhibits 1 and 2, admitted by stipulation), show a series of four posts with metal diagonally-striped warning-type signs along the south side of the road west of the guardrail. Those signs were not there on the night of the accident. The concrete base of the guardrail is off the edge of the pavement, maybe two feet.

Testifying as to a conversation with the defendant shortly after and at the scene of the occurrence, this witness said that she was obviously injured and "disoriented"; and that with regard to the occurrence she told him she was confused and didn't know what happened. An ambulance came within five minutes, taking defendant and deceased to the hospital. On cross-examination Grosskurth said that defendant "admittedly was confused," although he did not recall "if she specifically used 'confused' or whether she substituted another word." He also did not recall if she said "whether she was confused at the time of the accident or confused earlier, such as being lost."

*Thomas J. Crawford*

On the night of the accident, he was helping his son operate a gas station on the southeast corner of 127 Street and Harlem Avenue. The first he knew of the accident was when he heard a big noise and crash. He then saw that a car had crashed the railing of the bridge. The distance from the gas station driveway to the guardrail was approximately 300 feet—not a full block—and the lights from the station shone out almost to the bridge railing. 127th Street is four lanes wide east of Harlem. The wide

pavement stops "just to the west of the bridge, right near the bridge." It is a two-lane road all the way through, only at the intersection of Harlem it is four lanes. "After you get down about 100 yards, you come to the guardrail and the road narrows before it hits the bridge. After you cross the bridge it is then two lanes wide. When I looked down there that evening I didn't see any lights or reflectors." The car had moved from a brightly lighted area into the darkness of night.

(This witness testified on direct examination that he had determined from the sound of the motor as defendant's car had pulled out of the station that it was going fast. On cross-examination, however, he admitted that he had heard motors roar when the cars weren't even moving "so that the sound of the motor does not tell me how fast the car is going." He also admitted that he had not seen the car leave, stating, "I did not watch it going down the road, so I have no idea how fast it went." On motion of defendant, the court then struck all this witness' remarks on speed, and instructed the jury to disregard them.)

■ A cause of action against an automobile driver accrues to a guest occupant only if the guest sustains injuries caused by the wilful and wanton misconduct of the driver. Ill Rev Stats 1965, c 95½, § 9–201. The statute, however, does not define the term "wilful and wanton misconduct." Most opinions dealing with this subject contain a statement similar to the one found in Hering v. Hilton, 12 Ill2d 559, 562, 147 NE2d 311, where the court said, "Wilful and wanton misconduct has been defined in myriads of cases, each one reiterating or embellishing the phraseology of its predecessors." Customarily there then follows a definition of the term with more or less restrained reiteration or embellishment. We shall refrain altogether from drafting our own definition, partly be-

cause we have nothing new to offer in such a delineation, but, more importantly, because the skilled draftsmen of the committee which prepared IPI collected and studied the "myriads of cases" and distilled their language into a terse, but all-inclusive definition which we are happy to adopt. We consider it particularly appropriate in the instant case, because the IPI definition instruction would undoubtedly have been given to the jury and would have governed its deliberation if the court had not directed a verdict.

■ Tailoring the IPI definition to fit the case before us by eliminating the clause covering intentional injury, the instruction (14.01) reads:

> When I use the expression "wilful and wanton conduct" I mean a course of action which shows an utter indifference to or conscious disregard for a person's own safety and the safety of others.

■■ Our task, therefore, is to examine the proof in comparison with this standard; and, in so doing, we have no difficulty concluding that plaintiff's proof falls way short of the stated requirement, and that the trial judge performed his duty correctly in directing a verdict for defendant. Far from acting with "utter indifference to" or *"conscious* disregard for" the safety of her passenger, defendant was attempting to move one-car width to the adjoining lane, at the request of her passenger, and for the express purpose of enhancing the latter's feeling of safety. She had moved to the right less than a car width, in fact only a few feet, when the collision occurred. Ironically, if defendant had continued to drive in the lane which she herself had originally selected, this tragic occurrence would never have taken place. Attempting to comply with her friend's suggestion, however, she steered the car, without swerving quickly or suddenly, and without losing control of the car, into what she, and obviously her passenger also, expected would be the outside lane

of the highway. Their expectations were not reckless or thoughtless, because defendant could see the right-hand edge of the pavement and there were no signs or markers indicating that they were about to come to an abrupt narrowing of the road. Nor did the bridge abutment bear any lights, or even reflectors, to indicate in the dark night the deadly obstruction which lay ahead and which defendant never saw. Speed is not a factor in this case, since the statements of the gas station attendant on this subject were all stricken, and an uncontradicted speed of 25 to 35 miles per hour under the circumstances is not evidence of wilful and wanton misconduct. It was truly a horrible coincidence that at the very moment when defendant moved the car the short distance to the right to get into the adjoining lane, this lane of pavement, without warning of any kind, ceased to exist. The evidence is uncontroverted that the outside lane terminated directly in front of the culvert or bridge, and that a car moving in that lane at that point would "smash right into the guardrail." Unfortunately, that is precisely what happened in this case under circumstances which we believe make it very doubtful that there is any proof of ordinary negligence on the part of the driver, let alone wilful and wanton misconduct.

The correctness of the trial judge's decision in directing the verdict—and ours in agreeing that he was right in doing so—must be gauged by the rule recently declared by the Supreme Court in Pedrick v. Peoria & E. Ry. Co., 37 Ill2d 494, 229 NE2d 504. There, the court said that a verdict should be directed if "all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." Strictly construed, this might still leave the question open as to when a verdict will be permitted to stand. Considering the nature of the court's opinion, however, we believe that the pronouncement as made was intended to contain within

itself the standard for solution to the entire problem. Consequently, we conclude that a verdict in favor of one party cannot stand when the evidence, viewed in its aspect most favorable to such party, overwhelmingly favors the other party. Such a verdict would therefore be set aside by judgment notwithstanding the verdict, or, if the question were to be presented in advance, by directed verdict.

Applying this test (or any of the tests set forth in the Illinois cases prior to Pedrick), we find that all the evidence on liability, which we have outlined above, when considered in its aspect most favorable to plaintiff, overwhelmingly demonstrates that defendant was not guilty of wilful and wanton misconduct. In this circumstance, it was not merely a proper exercise of the trial court's discretion, but, rather, its duty to withdraw the case from the jury's consideration. Fosdick v. Servis, 40 Ill App2d 363, 367, 189 NE2d 538.

Because of the variety in the factual situations of cases approving or rejecting findings of wilful and wanton conduct, the authorities cited to us are of less than ordinary value. This is no doubt due to the infrequency with which cases involving wilful and wanton conduct reach the courts, in comparison with cases charging negligence.

Cases which were concerned with single vehicles striking obstructions (trees, posts, guardrails, embankment, etc.) off the side of the road include Pritchett v. Rich, 14 Ill App2d 215, 144 NE2d 173; Joiner v. Birch, 21 Ill App2d 249, 157 NE2d 676; Clarke v. Storchak, 384 Ill 564, 52 NE2d 229; Fosdick v. Servis, 40 Ill App2d 363, 189 NE2d 538; Bartolucci v. Falleti, 382 Ill 168, 46 NE 2d 980. Also, see Ficht v. Niedert Motor Service, Inc., 34 Ill App2d 360, 181 NE2d 386, which involved the collision of two moving vehicles. In each of these cases there were factors involved which would seem to weigh much more heavily on the plaintiff's side of the case than anything

127

to be found in the case at bar (e. g., speeds up to 55 miles per hour, icy road conditions, familiarity with the road, loss of control of the car, rain, and wet pavement), yet all the decisions held that the trial court properly had, or should have, taken the case from the jury. As precedents, these are all a fortiori situations, and yet all the reviewing courts concluded that there was a fatal lack of proof that the defendant had been conscious that his conduct would probably result in injury to anyone, or that he had exhibited a conscious or reckless indifference to consequences.

On the other hand, the cases cited to us which do find wilful and wanton conduct are all based upon much stronger facts. The defendant in Myers v. Krajefska, 8 Ill2d 322, 134 NE2d 277, had been drinking; he drove in mist and rain on a slick pavement, at 50 to 60 miles per hour; he saw signs and flares along the side of the road indicating a detour ahead; and he skidded nine-car lengths through a barricade into a gravel hopper. In Robinson v. Workman, 9 Ill2d 420, 137 NE2d 804, there was evidence that defendant was driving at 45 to 50 miles per hour and weaving from one side of the road to the other just before his car crashed in a head-on collision. Hatfield v. Noble, 41 Ill App2d 112, 190 NE2d 391, concerned a defendant who drive 80 miles per hour on a misty, rainy night over a road which he knew had many curves. He had also consumed twelve glasses of beer.

Smith v. Polukey, 22 Ill App2d 238, 160 NE2d 508, is another two-car intersection collision case in which the defendant saw the other car 200 feet away, was warned by the plaintiff's screams, and yet continued to accelerate to 60 miles per hour (in a 40-mile zone) prior to impact. In Schneiderman v. Interstate Transit Lines, 394 Ill 569, 69 NE2d 293, the defendant also had knowledge of impending danger before driving a bus through a red light at an intersection. Willmann v. Jargon, 37 Ill App2d 380, 185 NE2d 702, was a case in which the defendant attempted

to pass the vehicle ahead of him, even though he had a clear view of the road and knew he was approaching a curve.

In Hering v. Hilton, 12 Ill2d 559, 147 NE2d 311, the defendant, driving a dump truck on a side road, stopped at a traffic sign upon reaching a through highway. He saw plaintiff's car approaching, but looked no more in that direction, judging that he could complete his cross ahead of it. He failed to do so, and a collision resulted. Gaiennie v. Fringer, 5 Ill App2d 403, 5 NE2d 38, also involved a defendant who stopped at a stop sign and then, without looking in either direction, drove onto the preferential highway. Rosbottom v. Hensley, 61 Ill App2d 198, 209 NE2d 655, was a case in which the defendant driver turned her head around to talk to a friend in the back seat, lost control of the car, and drove off the road into a tree.

The facts in all these cases are, in our opinion, so different from those in the case before us that they are of no weight whatsoever in plaintiff's favor.

■ In conclusion, we deem it important to restate that "wilful and wanton misconduct is a more serious transgression than is negligence, and that an important distinction is in the mental attitude. Often negligence may consist of a mere inadvertence, or a momentary lapse from that degree of attentiveness required by due care. On the other hand, it is frequently said that a wanton act involves a *conscious indifference* to a known danger. It is based on the concept that, under the known or plainly observable circumstances, the doing or failing to do something will naturally and probably result in injury to another, and the defendant must have been aware of that situation, and ignored it." Martin v. Cline, 15 Ill App2d 269, 273, 145 NE2d 505. If we were to hold that the evidence in the instant case was sufficient to go to the jury on the issue of wilful and wanton misconduct, we would be eliminating the very real difference between such conduct

129

and ordinary negligence, thus merging the two concepts into one. And to do that would defeat the obvious legislative purpose of the guest statute. Todd v. Borowski, 25 Ill App2d 367, 375, 166 NE2d 296.

The judgment of the Circuit Court is affirmed.

Affirmed.

DRUCKER, J., concurs.

McCORMICK, J., dissenting.

In this dissenting opinion I will first quote from a Comment in 54 Northwestern University Law Review, page 263, which is a reappraisal of the Illinois Guest Statute in which it is pointed out that the Guest Statute substituted the test of "wilful and wanton" misconduct as the standard to be applied in determining duties and liabilities in the guest-host relationship. It discusses the way in which the Illinois courts have dealt with the statute and quotes from Myers v. Krajefska, 8 Ill2d 322, 329, 134 NE2d 277, where the court said:

> ". . . [wilful and wanton misconduct] is generally considered in that area of fault between ordinary negligence and actual malice. In view of the fact that it is a matter of degree a hard and thin line definition should not be attempted."

The reappraisal further points out (at page 271):

> "Because of the ever-increasing number of insured motorists today, the real defendant in an automobile negligence suit is the insurer. Thus, it is no longer the host who must be protected by statute to insure fairness. In fact, the uninsured motorist whom the statute originally protected is now in general disrepute and should not be the object of protection. In general, the only way in which the insured motorist can be pecuniarily damaged is through in-

creased premiums due to multiple actions brought against him, indicating a poor insurance risk."

The Comment states that the Illinois courts have interpreted the statute to defeat what was apparently originally intended, by elevating to wanton, acts which are merely gross negligence, and that such interpretation would cause insurers to settle cases rather than face a jury verdict. However, no matter whether the decisions of the court might indicate judicial dissatisfaction with the purposes of the statute, it might be said that the courts are merely restating the definition which they first pronounced prior to the Guest Statute. It is stated: "It is to be presumed that the legislature was aware of the court's interpretation of those terms when it used them in the act. Unless the legislature anticipated a new definition of the concept in line with the purposes of the act, the Guest Statute in Illinois is no less than what was intended."

The Comment also considers that question of why the insurer should receive the benefit which the statute is designed to confer. One reason advanced for the adoption of the statute was the ultimate saving to the person purchasing insurance, since every verdict obtained by an injured passenger increases the premium paid by the automobile owning public. It continues (at pages 273–274):

"However, the economic utility of the lowest possible insurance rates must be balanced against the social disutility of uncompensated victims. If present day theories of liability are economically incapable of providing the protection desired, alternatives must be found."

The Comment concludes by saying at page 274:

"In addition, the Guest Statutes in general have not succeeded in securing fairness to either host or guest, but rather have substantially benefitted insurers at

131

the expense of both parties. The uncertainty and subjectivity of the standard of 'fairness' negatives whatever attributes it may have. Nor can this substantial benefit to the insurer be justified on the basis of fear of collusion. Thus, it is suggested that aside from any alternatives which may be available, the Guest Statute no longer can be rationalized with the same arguments used by proponents a generation ago. When this factor is combined with trends in tort law it becomes fairly clear that some step must be taken to assure greater protection to potential victims of the ever-growing number of motor-vehicle owners and operators."

A comparatively recent case dealing with and analyzing the statute is Hering v. Hilton, 12 Ill2d 559, 147 NE2d 311. Mary Hering appealed from a judgment of the Appellate Court (13 Ill App2d 132, 140 NE2d 737) which reversed a judgment of the circuit court entered on a jury verdict allowing the plaintiff $7,000 as damages for personal injuries sustained in a collision between the plaintiff's automobile and the truck driven by defendant. Plaintiff's suit for damages was originally predicated on a single count charging defendant with wilful and wanton conduct. Defendant's motion for a directed verdict on the wilful and wanton count was denied, and the Appellate Court, considering only the propriety of the trial court's denial of the directed verdict on the wilful and wanton count, reversed the cause and held that the defendant was not guilty of such conduct as a matter of law. The Supreme Court said at page 562:

"Wilful and wanton misconduct has been defined in myriads of cases, each one reiterating or embellishing the phraseology of its predecessors. [Citing cases.] One often quoted definition is that set forth in Schneiderman v. Interstate Transit Lines, Inc., 394 Ill 569, at p 583: 'A wilful or wanton injury must

132

have been intentional or the act must have been committed under circumstances exhibiting a reckless disregard for the safety of others, such as a failure, after knowledge of impending danger, to exercise ordinary care to prevent it or a failure to discover the danger through recklessness or carelessness when it could have been discovered by the exercise of ordinary care.' In the recent case of Myers v. Krajefska, 8 Ill2d 322, this court refused to overrule that definition. The court noted that although there are some variations in the phraseology of the definitions of wilful and wanton misconduct in the cases, the basic concept as applied in the case law is the same, and since such conduct is usually a matter of degree, no hard-and-thin-line definition could be made."

The court further laid down the ordinary rule that in determining whether the wilful and wanton count should have been submitted to the jury, the defendant's conduct must be measured by the standard which the court previously laid down, and that there can be no conflict in the evidence considered, nor its weight or preponderance, nor the credibility of witnesses, but the court must take that evidence as true which is most favorable to plaintiff's cause of action. The court stated: "If such evidence and its intendments most favorable to plaintiff tend to establish wilful and wanton misconduct by defendant, then defendant's motion for a directed verdict was properly denied."

The court then discussed the evidence which indicated that the defendant proceeded into a preferred highway, failing to heed the warning of plaintiff's horn, and merely accelerated his speed so that the cars collided in about the center of the intersection. The court also called attention to the fact that the defendant argued that his action in driving ahead amounted only to an error of judgment

rather than to wilful and wanton misconduct. The court said, at page 564:

"With this we cannot agree. Labelling the conduct 'an error of judgment' does not free it from the taint of wilful and wanton misconduct, but merely begs the question, for practically all such collisions could be attributed to errors of judgment, and the query in each case is whether such error of judgment was in disregard of dangers which should have been apparent to a reasonable man. . . . ; it is sufficient if he had notice which would alert a reasonable man that substantial danger was involved, and that he failed to take reasonable precautions under the circumstances."

The judgment of the Appellate Court was reversed and the cause remanded to the Appellate Court with directions to consider the wilful and wanton issue in the light of the analysis set out in the case.

In Hatfield v. Noble, 41 Ill App2d 112, 118, 190 NE2d 391, the rule is laid down:

"For an act to be wilful and wanton, the defendant need not have intended that any harm should ensue, nor actually know for sure that there would be any harm done. It is sufficient if he had notice which would alert a reasonable man that substantial danger was involved and failed to take reasonable precautions under the circumstances. Hering v. Hilton, 12 Ill2d 559, 147 NE2d 311."

In Rosbottom v. Hensley, 61 Ill App2d 198, 209 NE2d 655, the court discussed at considerable length the elements of wilful and wanton conduct which would give rise to the liability of the driver of an automobile to a guest-occupant. The defendant argued that there was no showing that the defendant had knowledge or conscious-

134

ness that her conduct would be likely to result in injury, and that as a matter of law it should be held that she could not be guilty of wilful and wanton conduct. The court, at page 207, cited Gaiennie v. Fringer, 5 Ill App 2d 403, 126 NE2d 38, in which case the defendant had stopped at a highway stop sign, started forward, then drove 30 feet into the preferential highway without looking to the right or left. A guest-occupant warned defendant of the automobile approaching from the right, but defendant neither looked, stopped his car, or accelerated his vehicle to cross ahead of it. The court held it was a question for the jury and took the view that the defendant should be conscious from his knowledge of the surrounding circumstances that his conduct would naturally and probably result in injury.

The court, at pages 207–208, also cited Johnson v. Chicago N. W. Ry. Co., 9 Ill App2d 340, 132 NE2d 678, in which case the defendant grandmother drove her car with her granddaughter as an occupant onto a railroad crossing while the signals were operating and the approaching train was clearly visible, and she stopped the car. The court said there could be no claim of error of judgment where a person fails to discover the danger, or discovers the danger and ignores it. In answer to the argument that actual knowledge by the defendant was an essential element in proving wilful and wanton misconduct, the court quoted from Stephens v. Weigel, 336 Ill App 36, 82 NE2d 697, as follows:

" 'It is not necessary, however, that defendant intend that plaintiff should be injured by reason of his acts, nor is it necessary that the defendant actually know the dangers to which plaintiff is exposed. It is sufficient if he has notice which would alert a reasonably prudent man, and he does not take reasonable precautions under the circumstances.' "

The court affirmed the trial court in its refusal to direct a verdict or to grant a judgment notwithstanding the verdict, and discussed various cases from other jurisdictions, laying down the rule that if there is any evidence in the record showing such a gross want of care as indicates a wilful disregard of consequences it is a question of fact for the jury. Citing Walldren Express & Van Co. v. Krug, 291 Ill 472, 126 NE 97, the court said, at page 211:

> "While this opinion did not relate to the situation of a guest under the statute, that language has been employed in guest cases. Johnson v. Chicago & N. W. Ry. Co., 9 Ill App2d 340 at 355, 132 NE2d 678."

The court further stated (at page 212) what is regarded as the generally accepted rule that

> "Whether an act is wilful or wanton is greatly dependent upon the particular circumstances in the case and normally it is the peculiar province of the jury to weigh and try the evidence. Todd v. Borowski, 25 Ill App2d 367, at 375, 166 NE2d 296.
> "As stated in Lessen v. Allison, 25 Ill App2d 395, 166 NE2d 806, the opinions of the Supreme and Appellate Courts in this State indicated that it is an exceptional case where the question of wilful and wanton misconduct . . . is not a question for the jury."

The court held that there was sufficient evidence for the case to go to the jury.

In the case before us the defendant in her testimony estimated that, from the feel of the car, the speed at which she was driving was about 25 to 35 miles an hour, but that she did not look at the speedometer. There was testimony in the record (which, in the opinion of the writer of this dissent, was not properly stricken) that the station attendant, Crawford, had noticed the car went

very fast when it was leaving the station. The fact of speed is corroborated by the defendant's statement that she accelerated her speed from the time she pulled out of the station, that she had her foot on the gas at all times and was gaining speed as she proceeded east on 127th Street, and that at no time before the impact with the guardrail did she put on the brakes. She further testified that she had not put on her bright lights; that with the low lights she could see ahead 50 to 75 feet; that she traveled approximately 300 feet east of the edge of the station before the accident occurred, and that she was able to see the pavement of 127th Street and the south edge of it, but that she did not observe that the roadway narrowed, nor that there was a culvert within two feet of the edge of the road. She stated that she was driving with the left wheels of her car in the center of the road, or slightly over the center; that the decedent asked her to move to the right, and she moved the car across a space of pavement wide enough to accommodate two cars and approximately two feet beyond the pavement, to contact the guardrail. There was testimony in the record that the right front end of the car and the west end of the guardrail were extensively damaged.

These facts, together with the testimony as to the width of the road, are sufficient evidence favorable to plaintiff's cause of action when considered with the inferences which might properly be drawn therefrom to support the allegations of the complaint.* The direction of a verdict was error. Under this evidence it certainly could not be said that all reasonable men would agree that the acts of the defendant would not be a failure to discover

---

* The majority opinion, reciting testimony of the defendant, says: "Defendant was not confused after learning the way at the gas station, although she had been confused prior to that time." Grosskurth, the Illinois State Trooper, testified that when he arrived at the scene of the accident, within 10 minutes, the defendant told him she was confused and didn't know what happened.

danger through negligence or carelessness when it could have been discovered by the exercise of ordinary care.

In Martin v. Cline, 15 Ill App2d 269, 273, 145 NE2d 505, the court said:

> "It is, of course, difficult to lay down a general rule by which we may determine what type of conduct the law considers to be wilful and wanton misconduct. However, it may be stated generally that wilful and wanton misconduct is a more serious transgression than is negligence, and that an important distinction is in the mental attitude. Often negligence may consist of a mere inadvertence, or a momentary lapse from that degree of attentiveness required by due care. On the other hand, it is frequently said that a wanton act involves a *conscious indifference* to a known danger. It is based on the concept that, under the known or plainly observable circumstances, the doing or failing to do something will naturally and probably result in injury to another, and the defendant must have been aware of that situation, and ignored it.
>
> "Ill will is not a necessary element, that is, there need not be an intention to cause harm. But if one knows, or should know by reason of surrounding circumstances, that the safety of another is in peril as a result of what he does or does not do, and he intentionally ignores this fact and does not regulate his conduct in accordance with such knowledge then such a conscious indifference to consequences does not constitute wilfulness. [Citing cases.]"

In Larson v. Harris, 77 Ill App2d 430, 435, 222 NE 2d 566, the court, in affirming the trial court which submitted the question of whether or not the defendant was guilty of wilful and wanton misconduct, cited and quoted

138

from Lessen v. Allison, 25 Ill App2d 395, 401, 402, 166 NE2d 806, as follows:

" 'The more recent cases of the Supreme Court of this state indicate that it is the exceptional case wherein it can be said that the question of wilful and wanton misconduct on the part of the driver or contributory wilful and wanton misconduct on the part of the guest is not a question of fact for the jury.' "

The case of Pedrick v. Peoria & Eastern Ry. Co., 37 Ill2d 494, 229 NE2d 504, is not applicable.

In the instant case, the failure of the defendant to discover the danger when it could have been discovered by the exercise of ordinary care, was a question which should have been left to the jury to determine whether or not this conduct constituted a wilful and wanton act. Koch v. Lemmerman, 12 Ill App2d 237, 139 NE2d 806.

It is not the function of a reviewing court to interpret the statute to defeat the intention of the legislature. The judgment of the Circuit Court of Cook County should be reversed and the case remanded for a new trial.